1  LAWYERS FOR CLEAN WATER, INC.
2  Layne Friedrich (Bar No.  195431)
        Email:  layne@lawyersforcleanwater.com
3  Drevet Hunt (Bar No. 240487)
        Email: drev@lawyersforcleanwater.com
4  1004-A O'Reilly Avenue
5  San Francisco, California 94129
   Telephone:  (415) 440-6520
6  Facsimile:  (415) 440-4155
7
8  *Attorneys for Plaintiff*
   CALIFORNIA SPORTFISHING PROTECTION ALLIANCE
9
10
11  **UNITED STATES DISTRICT COURT**
    **EASTERN DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a California non-profit corporation, | Civil Case No. |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| Plaintiff, | |
| vs. | |
| SYAR INDUSTRIES, INC., a California corporation; SYAR CONCRETE, LLC, a California limited liability company; | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |
| Defendants. | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Complaint

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On March 21, 2014, CSPA issued a sixty (60) day notice of intent to sue ("Notice Letter") to Syar Industries, Inc. and Syar Concrete, LLC (collectively "Defendants"). The Notice Letter informed Defendants of their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act. The Notice Letter also informed Defendants of CSPA's intent to file suit against them to enforce the Storm Water Permit and the Clean Water Act.

3.    The Notice Letter was sent to the registered agents for Defendants, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as Exhibit 1 and is incorporated herein by reference.

4.    More than sixty (60) days have passed since the Notice Letter was served on Defendants and the state and federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither EPA nor the State of California has commenced or is

1  diligently prosecuting an action to redress the violations alleged in this Complaint. *See* 33

2  U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty

3  under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

4      5.    Venue is proper in the Eastern District of California pursuant to Section

5  505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the

6  violations are located within this judicial district.

7      6.    Defendants' violations of the procedural and substantive requirements of the

8  Storm Water Permit and the Clean Water Act alleged in this Complaint are ongoing and

9  continuous.

10  **II.  INTRODUCTION**

11      7.    This Complaint seeks relief for Defendants' substantive and procedural

12  violations of the Storm Water Permit and the Clean Water Act resulting from

13  Defendants' operations at 960 Gladding Road, Lincoln, California 95648 ("Syar Lincoln

14  Facility" or "Facility"), including Defendants' discharges of polluted storm water from

15  the Facility.[1]

16      8.    Defendants discharge polluted storm water into Markham Ravine, which

17  joins the Auburn Ravine at the East Side Canal, then the Sacramento River, which

18  discharges to the Pacific Ocean (collectively "the Receiving Waters").

19      9.    With every storm event, hundreds of millions of gallons of polluted

20  rainwater, originating from industrial operations such as the Syar Lincoln Facility, pour

21  into surface waters. The consensus among water quality agencies and specialists is that

22  storm water pollution accounts for more than half of the total pollution entering marine

23  and river environments each year. The waters into which the Defendants discharge are

24  ecologically sensitive areas and are essential habitat for fish and bird species as well as

25  macro-invertebrate and invertebrate species. Storm water contaminated with sediment,

26  heavy metals, and other pollutants harm the special aesthetic and recreational significance

27

28  [1] The Syar Lincoln Facility is described in detail in the Notice Letter attached as Exhibit 1.

Complaint                  3

that these waters have for people in the surrounding communities. The public's use of these waters for water contact recreation exposes many people to toxic metals and other contaminants in storm water. Non-contact recreation and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges into these waters.

**III.    PARTIES**

    **A.    California Sportfishing Protection Alliance.**

    10.    Founded in 1983, CSPA is a non-profit public benefit conservation and research organization formed under section 501(c)(3) of the Internal Revenue Code, and located at 3536 Rainier Avenue in Stockton, California 95204.

    11.    CSPA's mission is to conserve, restore, and enhance the state's water quality, wildlife, fishery resources, aquatic ecosystems, and associated riparian habitats.

    12.    To further this mission, CSPA actively seeks federal, state, and local agency implementation of environmental regulations and statutes and routinely participates in administrative, legislative, and judicial proceedings. When necessary, CSPA directly initiates enforcement actions on behalf of itself and its members.

    13.    CSPA has approximately 2,000 members who live, use, enjoy, and/or recreate in and around the Receiving Waters. CSPA's members use and enjoy the Receiving Waters for fishing, boating, swimming, diving, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking, engaging in scientific study, monitoring the watershed, and/or conducting watershed restoration.

    14.    Discharges of polluted storm water from the Syar Lincoln Facility degrade water quality, harm aquatic life in the Receiving Waters, and impair CSPA's members' use and enjoyment of the Receiving Waters.

    15.    Defendants' polluted discharges from the Syar Lincoln Facility are ongoing and continuous. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the Storm Water Permit.

    **B.    The Syar Lincoln Facility Owners and/or Operators.**

16.    CSPA is informed and believes, and thereon alleges, that Syar Industries, Inc. is an owner of the Syar Lincoln Facility.

17.    CSPA is informed and believes, and thereon alleges, that Syar Industries, Inc. has owned the Syar Lincoln Facility since at least October 29, 2009.

18.    CSPA is informed and believes, and thereon alleges, that Syar Industries, Inc. is an operator of the Syar Lincoln Facility.

19.    CSPA is informed and believes, and thereon alleges, that Syar Industries, Inc. has operated the Syar Lincoln Facility since at least October 29, 2009.

20.    CSPA is informed and believes, and thereon alleges, that Syar Industries, Inc. is an active corporation registered in California.

21.    CSPA is informed and believes, and thereon alleges, that the Registered Agent for Syar Industries, Inc. is Ralston P. Roberts, located at 2301 Napa-Vallejo Highway, Napa, California 94558.

22.    CSPA is informed and believes, and thereon alleges, that Syar Concrete, LLC is an owner of the Syar Lincoln Facility.

23.    CSPA is informed and believes, and thereon alleges, that Syar Concrete, LLC has owned the Syar Lincoln Facility since at least October 29, 2009.

24.    CSPA is informed and believes, and thereon alleges, that Syar Concrete, LLC is an operator of the Syar Lincoln Facility.

25.    CSPA is informed and believes, and thereon alleges, that Syar Concrete, LLC has operated the Syar Lincoln Facility since at least October 29, 2009.

26.    CSPA is informed and believes, and thereon alleges, that Syar Concrete, LLC is an active limited liability company registered in California.

27.    CSPA is informed and believes, and thereon alleges, that the Registered Agent for Syar Concrete, LLC is Ralston P. Roberts, located at 2301 Napa-Vallejo Highway, Napa, California 94558.

28.    CSPA refers to Syar Industries, Inc. and Syar Concrete, LLC collectively as the "Syar Lincoln Facility Owners and/or Operators."

## IV.      LEGAL BACKGROUND

### A.      The Clean Water Act and California's Storm Water Permit.

29.      Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a).

30.      Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

31.      Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide, general NPDES permit applicable to all industrial storm water dischargers. *See id.*

32.      California is a state authorized by the EPA to issue NPDES permits.

33.      The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act. *See* Storm Water Permit, Finding No. 15.

34.      In order to discharge storm water lawfully in California, industrial storm water dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit.

35.      Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section C(1) (Standard Provisions).

36.      Waters of the United States include traditionally navigable waters, tributaries to traditionally navigable waters, wetlands, and wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. *See Rapanos v. U.S.,* 126 S. Ct. 2208 (2006).

37.     The Clean Water Act also confers jurisdiction over waters that have a significant nexus to the navigable water. *Rapanos,* 126 S. Ct. at 2248-49. A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Id.* at 2248.

38.     Each of the Receiving Waters is a "water of the United States" within the meaning of Section 502(7) of the Clean Water Act. *See* 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a).

39.     Section 505(a)(1) of the Clean Water Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

40.     Syar Industries, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

41.     Syar Concrete, LLC is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

42.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

43.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

44.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.     Effluent Limitation B(3) of the Storm Water Permit.**

45.     Effluent Limitation B(3) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activities in storm water discharges through the implementation of Best Available Technology Economically Achievable

("BAT") for toxic or non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform, among others.

46.     In states not delegated to implement the Clean Water Act, EPA regulates industrial stormwater pollution with the *NPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity* ("MSGP"), which includes numeric benchmarks for pollutant concentrations in storm water discharges ("Benchmark Levels").

47.     The Benchmark Levels provide an objective standard to determine whether a facility's Best Management Practices ("BMPs") are successfully developed and/or implemented. *See* MSGP Fact Sheet, at 95 (2008), *available at* http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf.

48.     Discharges from an industrial facility containing pollutant concentrations that exceed Benchmark Levels indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants. *Id.*

**C.     Receiving Water Limitations C(1) and C(2) of the Storm Water Permit.**

49.     Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges that adversely impact human health or the environment.

50.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

51.     Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges that "cause or contribute to an exceedance of any applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional

1  Board's Basin Plan."

2  52.   Water Quality Standards ("WQS") are pollutant concentration levels

3  determined by the State Board, the various regional boards, and/or the EPA to be

4  protective of the beneficial uses of the waters that receive polluted discharges.

5  53.   WQS applicable to dischargers covered by the Storm Water Permit include,

6  but are not limited to, those set out in the *Water Quality Control Plan for the Sacramento

7  River and San Joaquin River Basins*, California Regional Water Quality Control Board,

8  Central Valley Region (4th Ed., revised Oct. 2011) ("Basin Plan"), and in the Criteria for

9  Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

10  54.   The CTR includes numeric criteria set to protect human health and the

11  environment in the State of California.[2]

12  55.   The Basin Plan identifies the "Beneficial Uses" of water bodies in the region

13  in which the Syar Lincoln Facility is located.

14  56.   The Beneficial Uses for the Receiving Waters, which receive polluted storm

15  water discharges from the Syar Lincoln Facility, collectively include agriculture supply

16  (AGR), municipal and domestic supply (MUN), water contact recreation (REC 1), non-

17  contact water recreation (REC 2), cold freshwater habitat (COLD), warm freshwater

18  habitat (WARM), wildlife habitat (WILD), migration of aquatic organisms (MIGR),

19  spawning, reproduction, and development (SPWN), and navigation (NAV). *See* Basin

20  Plan at II-1.00 – II-8.00.

21  57.   A surface water that cannot support a listed Beneficial Use is designated as

22  an impaired water body pursuant to Section 303(d) of the Clean Water Act. *See* 33 U.S.C.

23  § 1313(d).

24  58.   A discharge of a pollutant at a level above an applicable WQS, such as the

25  CTR, causes and/or contributes to the impairment of the Beneficial Uses of the waters

26

27  _____

[2] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic

28  Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available
at*: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

receiving the discharges.

59.    The Sacramento River is impaired by mercury and unknown toxicity.[3]

60.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the Storm Water Permit.

**D.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

61.    Section A(1) and Provision E(2) of the Storm Water Permit require dischargers to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit prior to commencing industrial activities.

62.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

63.    Section A(3) of the Storm Water Permit requires a discharger to identify the members of its on-site Storm Water Pollution Prevention Team and to indicate each team member's responsibilities in developing, implementing, and revising the SWPPP as to ensure compliance with the Storm Water Permit.

64.    Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains, among other requirements: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance, and discharge system and structural control measures

---

[3] 2010 Integrated Report – All Assessed Waters, available at: http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last accessed on April 4, 2014).

that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

65.     Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

66.     Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water discharges.

67.     Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

68.     Section A(7)(a) of the Storm Water Permit requires that the SWPPP include a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants are likely to be present in the storm water discharges. Section A(7)(b) of the Storm Water Permit requires that the SWPPP include a summary of the areas of the facility that are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges.

69.     Section A(8) of the Storm Water Permit requires that the SWPPP include a narrative description of the storm water BMPs to be implemented at the facility for each potential pollutant and its source. BMPs shall be developed and implemented to reduce or prevent pollutants in storm water discharges. *Id.* Dischargers must develop and implement structural and/or non-structural BMPs. *Id.*

70.     Section A(9) of the Storm Water Permit requires that the discharger evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the

1  Storm Water Permit.

2       71.   Sections A(9)(a)-(c) of the Storm Water Permit require that the discharger

3  conduct an annual comprehensive site compliance evaluation that includes a review of all

4  visual observation records, inspection reports, and sampling and analysis results; a visual

5  inspection of all potential pollutant sources for evidence of, or the potential for, pollutants

6  entering the drainage system; a review and evaluation of all BMPs to determine whether

7  the BMPs are adequate, properly implemented and maintained, or whether additional

8  BMPs are needed; and a visual inspection of equipment needed to implement the

9  SWPPP.

10      72.   Section A(9)(d) of the Storm Water Permit requires that the discharger

11  submit an evaluation report that includes identification of personnel performing the

12  evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for

13  implementing SWPPP revisions, any incidents of non-compliance and the corrective

14  actions taken, and certification that the discharger is in compliance with the Storm Water

15  Permit. If certification of compliance cannot be provided, the discharger must explain in

16  the evaluation report why the facility is not in compliance with the Storm Water Permit.

17  Storm Water Permit, Section A(9)(d). The evaluation report shall be submitted as part of

18  the Annual Report, which is specified in Section B(14) of the Storm Water Permit. Storm

19  Water Permit, Section B(14).

20      73.   Section A(10) of the Storm Water Permit requires that the discharger revise

21  the SWPPP as necessary prior to changes in industrial activities, or as otherwise required

22  by the Storm Water Permit.

23       **E.    The Storm Water Permit's Monitoring and Reporting Requirements.**

24      74.   Section B(1) and Provision E(3) of the Storm Water Permit require

25  dischargers to develop and implement a Monitoring and Reporting Program ("M&RP")

26  prior to commencing industrial activities.

27      75.   The objectives of the M&RP are to confirm that BMPs have been adequately

28  developed and implemented such that storm water and non-storm water discharges

comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

76.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Storm Water Permit, Sections B(2)(c) and B(2)(d).

77.    Section B(2)(d) of the Storm Water Permit requires that the M&RP "shall be revised" as necessary to ensure compliance with the Storm Water Permit.

78.    Section B(3) of the Storm Water Permit requires a discharger to conduct visual observations of all drainage areas within the facility for the presence of authorized and unauthorized non-storm water discharges. Observations under this section must occur during daylight hours, on days with no storm water discharges, and during scheduled facility operating hours.

79.    Section B(4) of the Storm Water Permit requires a discharger to conduct visual observations of storm water discharges during the first hour of discharge, at each discharge point, of at least one storm event per month during the Wet Season (October 1 – May 30). Observations under this section must take place during daylight hours, on days when the discharge is preceded by at least three (3) days without storm water discharges, and during scheduled facility operating hours.

80.    Visual observations conducted under Sections B(3) and B(4) of the Storm Water Permit must be recorded. Records of observations must describe the presence of any floating or suspended materials, O&G, discolorations, turbidity, odor, and the source of any pollutants observed during the visual observation. Dischargers must maintain records of visual observations that include the observation date, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. Furthermore, Sections B(3) and B(4) require a discharger to revise a facility's SWPPP in order to rectify any instances of noncompliance observed during visual observations.

81.    Sections B(5) and B(7) of the Storm Water Permit require dischargers to

Complaint                                    13

visually observe and collect samples of storm water discharges from all locations where storm water is discharged.

82.     Section B(5)(a) of the Storm Water Permit requires dischargers to collect storm water samples during the first hour of discharge. Samples of storm water discharges must be collected from the first storm event of the Wet Season and at least one other storm event in the Wet Season. *Id.* All storm water discharge locations must be sampled. *Id*.

83.     Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events during the Wet Season, and must explain in the Annual Report why the first storm event was not sampled. *Id.*

84.     Section B(5)(b) requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours on days that are preceded by at least three (3) working days without storm water discharge.

85.     Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and O&G. A discharger may substitute analysis for total organic carbon ("TOC") instead of O&G.

86.     Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to analyze each storm water sample for toxic chemicals and other pollutants likely to be present in the storm water discharged from the facility in significant quantities.

87.     Section B(5)(c)(iii) and Table D of the Storm Water Permit require facilities classified as Sector E (Standard Industrial Classification ("SIC") Code 3273) to analyze storm water samples for iron and as otherwise required by the Regional Board.

88.     Section B(14) of the Storm Water Permit requires dischargers to submit an Annual Report to the applicable regional board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section

A(9) of the Storm Water Permit, an explanation of why a facility did not implement any required activities, and other records specified in Section B(13) of the Storm Water Permit.

89.     Section C(9) of the Storm Water Permit requires that all reports, certifications, or other information required by the Storm Water Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators.

90.     Section C(10) of the Storm Water Permit requires any signatory subject to Section C(9) to make the following certification: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

91.     Section C(11)(d) of the Storm Water Permit requires facility operators to report any incidence of noncompliance with the Storm Water Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance.

**F.     California Water Code Section 13267.**

92.     Section 13267(a) of the California Water Code gives regional boards authority to inspect any industrial facility operating under the Storm Water Permit to investigate the facility's impacts on water quality.

93.     A regional board conducting an inspection pursuant to Section 13267(a) of

the California Water Code may issue a Notice of Violation and Water Code Section 13267 Order for Technical Report ("13267 Order") to the industrial facility, requiring the facility to submit requested technical or monitoring program reports to the regional board, pursuant to Section 13267(b) of the California Water Code.

94.     Section 505 of the Clean Water Act allows citizens to commence civil actions against any person who (1) is alleged to be in violation of an effluent standard or limitation or (2) an order issued by the Administrator or a State with respect to such a standard or limitation. 33 U.S.C. § 1365(a)(1).

95.     The Storm Water Permit is an effluent standard or limitation as defined by the Clean Water Act. *See* 33 U.S.C. § 1342; *see also* 40 C.F.R § 123.25.

96.     A 13267 Order is an order issued with the respect to the Storm Water Permit because it is issued after a regional board inspects an industrial facility for purposes of reviewing its compliance with the Storm Water Permit and determines that additional information or action is needed from the facility to comply with the Storm Water Permit.

97.     Since a 13267 Order is an order issued with respect to the Storm Water Permit, which is an effluent standard or limitation, citizens may bring civil actions to enforce violations of 13267 Orders. *See* 33 U.S.C. § 1365(a)(1).

## V.     FACTUAL BACKGROUND

### A.     The Syar Lincoln Facility's Storm Water Permit Coverage.

98.     On or before October 29, 2009, Syar Industries, Inc. submitted a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("2009 NOI") for the Syar Lincoln Facility. Syar Concrete, LLC was listed as the Facility Operator on the 2009 NOI.

99.     The Syar Lincoln Facility Owners and/or Operators filed a Notice of Termination on September 27, 2012 ("2012 NOT") indicating their intent to terminate coverage under the Storm Water Permit for the Syar Lincoln Facility because the Facility had closed.

100.   The Regional Board granted the 2012 NOT on October 10, 2012.

101.   The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the Syar Lincoln Facility Waste Discharge Identification ("WDID") number assigned after the 2009 NOI was submitted as 5S31I022387.

102.   SMARTS lists the Syar Lincoln Facility, WDID 5S31I022387, as having "terminated" coverage under the Storm Water Permit.

103.   On or before December 19, 2012, Syar Industries, Inc. submitted a second Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("2012 NOI") for the Syar Lincoln Facility. Syar Concrete, LLC was again listed as the Facility Operator on the 2012 NOI.

104.   The State Board confirmed receipt of the 2012 NOI on December 27, 2012 ("2012 NOI Receipt").

105.   The 2012 NOI Receipt and SMARTS list the current Syar Lincoln Facility WDID number as 5S31I023993.

106.   SMARTS lists the Syar Lincoln Facility, WDID number 5S31I023993, as having "active" coverage under the Storm Water Permit.

107.   The 2012 NOI and 2012 NOI Receipt list the SIC code for the Facility as 3273.

**B.     Industrial Activities at the Syar Lincoln Facility.**

108.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility is approximately 3.1 acres in size.

109.   CSPA is informed and believes, and thereon alleges, that the following industrial activities are conducted at the Syar Lincoln Facility: production of ready mix concrete (including moving raw materials with conveyors and machinery, preparing concrete, and depositing concrete in mixer trucks), maintenance and lubrication of concrete mixer trucks and associated industrial equipment, vehicle and equipment cleaning (including wash-out of concrete mixer trucks), waste material storage in dumpsters and other containers prior to disposal, and raw material storage (including

cement, fly ash, rock, sand silt, and/or clay).

110.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility generates, handles, and stores hazardous wastes, including batteries, hydraulic oil, waste oil, used antifreeze, and waste gasoline.

111.   CSPA is informed and believes, and thereon alleges, that industrial operations at the Facility are sources of pollutants and include: outdoor material handling and storage areas, ready mix concrete production areas and activities, vehicle and equipment maintenance activities and areas, vehicle and equipment cleaning activities and areas, hazardous waste storage areas, parking areas, loading and unloading areas, areas with truck traffic and associated track-off of pollutants, material processing areas, loose piles of scrap materials, waste dumpsters, and on-site material handling equipment.

112.   CSPA is informed and believes, and thereon alleges, that the pollutants associated with operations at the Syar Lincoln Facility include, but are not limited to: sediment; dust and particulates; petroleum hydrocarbons; coolant; used oil filters; waste antifreeze; used oil; sulfuric acid; solvents; pesticides; recycled water used in concrete production; hydraulic fluids; cement; fly ash; diesel fuel; motor oil; chromium (VI); total nitrogen ("N+N"); TSS; metals such as mercury, zinc, copper, iron, aluminum, and lead; biological oxygen demand-affecting substances; chemical oxygen demand-affecting substances; and pH-affecting substances.

113.   CSPA is informed and believes, and thereon alleges, that industrial activities at the Syar Lincoln Facility are conducted outdoors and without adequate cover or other BMPs to prevent the exposure of industrial activities to rainfall.

114.   CSPA is informed and believes, and thereon alleges, that pollutants associated with the Syar Lincoln Facility's industrial operations are disbursed throughout the Facility.

115.   CSPA is informed and believes, and thereon alleges, that there is inadequate secondary contaminant at the Facility, and inadequate measures to prevent polluted storm water from discharging from the Facility.

116.   CSPA is informed and believes, and thereon alleges, that materials associated with industrial activities are stored near driveways and other discharge points at the Syar Lincoln Facility.

117.   CSPA is informed and believes, and thereon alleges, that O&G, trash, debris, heavy metals, and other pollutants have been and continue to be tracked throughout the Syar Lincoln Facility.

118.   CSPA is informed and believes, and thereon alleges, that pollutants accumulate at outdoor material handling and storage areas; ready mix concrete production areas; material processing areas; vehicle and equipment maintenance, storage, and cleaning areas; hazardous waste storage areas; parking lots and driveways leading to adjacent streets; loading and unloading areas; truck traffic areas; dumpsters; and the surrounding municipal streets themselves.

119.   CSPA is informed and believes, and thereon alleges, that trucks and vehicles leaving the Syar Lincoln Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, O&G, metal particles, trash, debris, and other pollutants off-site.

120.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs to prevent the exposure of pollutants and their sources to storm water flows at the Syar Lincoln Facility, in violation of the Storm Water Permit and the Clean Water Act.

121.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs sufficient to reduce or prevent pollutants in storm water discharged from the Syar Lincoln Facility, as required by the Storm Water Permit and the Clean Water Act.

122.   The failure to properly develop and implement BMPs for pollutants and their sources results in the discharge of pollutants from the Syar Lincoln Facility in violation of the Storm Water Permit and the Clean Water Act.

/ / /

**C.    Storm Water Discharges at the Syar Lincoln Facility.**

123.   CSPA is informed and believes, and thereon alleges, that there are at least four (4) discharge points at the Syar Lincoln Facility. CSPA refers to these discharge points as Discharge Points #1 – 4.

124.   CSPA is informed and believes, and thereon alleges, that Discharge Point #1 is a pipe that originates at a drop inlet in the northeast area of the Facility and discharges directly to the Markham Ravine.

125.   CSPA is informed and believes, and thereon alleges, that Discharge Point #1 receives storm water flows from the eastern portion of the Facility.

126.   CSPA is informed and believes, and thereon alleges, that Discharge Point #2 is a drainage swale that flows to a roadside ditch on the western boundary of State Highway 65, which then discharges to the Markham Ravine.

127.   CSPA is informed and believes, and thereon alleges, that Discharge Point #2 receives storm water flows from the western portion of the Facility.

128.   CSPA is informed and believes, and thereon alleges, that Discharge Point #3 is a driveway leading from the southeastern corner of the Facility to Gladding Road.

129.   CSPA is informed and believes, and thereon alleges, that Discharge Point #3 receives storm water flows from the southeastern portion of the Facility.

130.   CSPA is informed and believes, and thereon alleges, that Discharge Point #4 is a driveway leading from the southwestern corner of the Facility to Gladding Road.

131.   CSPA is informed and believes, and thereon alleges, that Discharge Point #4 receives storm water flows from the southwestern portion of the Facility.

132.   CSPA is informed and believes, and thereon alleges, that Discharge Points #1 – 4 flow to the Receiving Waters.

### D.   Markham Ravine and Downstream Waters

133.   Markham Ravine is a tributary to the Sacramento River.

134.   Prior to channelization of its lower reaches to facilitate agricultural water supply and drainage purposes, the Markham Ravine flowed directly to the Sacramento River. Today, the Markham Ravine flows to the East Side Canal, which also carries flows

from Coon Creek and Auburn Ravine to the Sacramento River.

135.   Markham Ravine serves flood control and management purposes. These flood control and management services affect the physical, chemical, and biological integrity of downstream waters, including the Sacramento River.

136.   Markham Ravine provides for the physical transport of water, sediment, dissolved and suspended pollutants, and organic matter to downstream waters. This transport of materials via the Markham Ravine affects the physical, chemical, and biological integrity of downstream waters, including the Sacramento River.

137.   Markham Ravine provides habitat for riparian and aquatic dependent species in the Sacramento River watershed. This provision of habitat in the Markham Ravine affects the physical, chemical, and biological integrity of downstream waters, including the Sacramento River.

138.   There are numerous similarly situated tributaries to the Sacramento River in the region near the Markham Ravine. These similarly situated tributaries provide ecosystem services similar to that of Markham Ravine. These ecosystems services affect the physical, chemical, and biological integrity of the Sacramento River.

139.   Markham Ravine has several wetland complexes that are adjacent to it along its length. Discharges from Discharge Point #2 at the Syar Lincoln Facility enter one such wetland.

140.   The wetlands adjacent to the Markham Ravine, including the one receiving discharges from the Syar Lincoln Facility, serve flood control and management purposes. These flood control and management purposes affect the physical, chemical, and biological integrity of downstream waters, including the Sacramento River.

141.   The wetlands adjacent to the Markham Ravine, including the one receiving discharges from the Syar Lincoln Facility, serve to filter and capture pollutants. This pollutant filtering and capturing affects the physical, chemical, and biological integrity of downstream waters, including the Sacramento River.

142.   The wetlands adjacent to the Markham Ravine, including the one receiving

discharges from the Syar Lincoln Facility, provide for the physical transport of water, sediment, dissolved and suspended pollutants, and organic matter to downstream waters. This transport of materials affects the physical, chemical, and biological integrity of downstream waters, including the Sacramento River.

143.   The wetlands adjacent to the Markham Ravine, including the one receiving discharges from the Syar Lincoln Facility, provides habitat for riparian and aquatic species in the Sacramento River watershed. This provision of habitat in the wetlands adjacent to the Markham Ravine, including the one receiving discharges from the Syar Lincoln Facility, affects the physical, chemical, and biological integrity of downstream waters, including the Sacramento River.

144.   There are numerous similarly situated wetlands along tributaries to the Sacramento River in the region near Markham Ravine. These similarly situated wetlands provide ecosystem services similar to that of Markham Ravine. These ecosystem services affect the physical, chemical, and biological integrity of the Sacramento River.

145.   Markham Ravine is a water of the United States.

146.   The wetland adjacent to Markham Ravine into which storm water from the Syar Lincoln Facility discharges is a water of the United States.

147.   The Sacramento River is navigable in fact.

148.   The Sacramento River is a water of the United States.

**E.     The Storm Water Discharges at the Syar Lincoln Facility Contain Elevated Levels of Pollutants.**

149.   Samples of storm water discharges collected at the Syar Lincoln Facility contain levels of pollutants in excess of Benchmark Levels. *See* Exhibit 1 at § II.A and Exhibit A (table attached to Notice Letter identifying specific storm water samples with aluminum, chromium (VI), SC, iron, N+N, pH, TSS, and copper concentrations above Benchmark Levels).

150.   CSPA is informed and believes, and thereon alleges, that repeated exceedances of Benchmark Levels demonstrate that Defendants failed and continue to

fail to develop and/or implement BMPs at the Facility that achieve compliance with BAT/BCT standards.

151.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur each time storm water discharges from the Syar Lincoln Facility.

152.   Samples of storm water discharges collected at the Syar Lincoln Facility contain levels of pollutants in excess of WQS. *See* Exhibit 1 at § II.B (identifying specific storm water samples with copper, iron, chromium (VI), and pH concentrations above WQS).

153.   Samples of storm water discharges collected at the Syar Lincoln Facility contain concentrations of pollutants at levels known to adversely impact aquatic species and the environment. *See* Exhibit 1 at § II.B.

**F.     Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements.**

154.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed and continue to fail to develop a SWPPP for the Syar Lincoln Facility that complies with Section A of the Storm Water Permit.

155.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed and continue to fail to implement a SWPPP for the Syar Lincoln Facility that complies with Section A of the Storm Water Permit.

156.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed and continue to fail to revise the SWPPP for the Syar Lincoln Facility as necessary to ensure compliance with the Storm Water Permit.

157.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility SWPPP fails to clearly identify the Storm Water Permit-related responsibilities and duties of the named Pollution Prevention Team members, as required by Section A(3) of the Storm Water Permit.

158.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln

Facility SWPPP site map does not include, among other elements, an outline of all drainage areas within the facility boundaries, areas of soil erosion, nearby waterbodies, locations where materials are directly exposed to precipitation, and all areas of industrial activity, as required by Section A(4).

159.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility SWPPP does not include a narrative description of all of the Facility's industrial processes, associated potential pollutant sources, or potential pollutants, as required by Section A(6) of the Storm Water Permit.

160.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility SWPPP does not include an adequate description of the dust and particulates that are generated at the Facility, as required by Section A(6) of the Storm Water Permit.  Nor does it include an adequate description of the discharge locations or the primary areas of the Facility where dust and particulate pollutants would settle, as required by Section A(6) of the Storm Water Permit.

161.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility SWPPP does not properly describe non-storm water discharges at the Facility or BMPs used to prevent the discharge of non-storm water at the Facility, as required by Section A(6) of the Storm Water Permit.

162.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility SWPPP does not include a narrative assessment of all of the Facility's industrial processes and potential pollutant sources, as required by Section A(7) of the Storm Water Permit.

163.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility SWPPP does not include a narrative description of the BMPs to be implemented at the Facility for each potential pollutant and its source, as required by Section A(8) of the Storm Water Permit.

164.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility SWPPP does not include adequate BMPs to reduce or prevent pollutants in storm

water discharges to levels required by the Storm Water Permit.

### G.    Defendants' Failure to Comply with the Storm Water Permit's M&RP Requirements.

165.    CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed and continue to fail to develop an adequate M&RP for industrial operations at the Syar Lincoln Facility that complies with Section B of the Storm Water Permit.

166.    CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed and continue to fail to implement an adequate M&RP for industrial operations at the Syar Lincoln Facility that complies with Section B of the Storm Water Permit.

167.    CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed and continue to fail to revise the M&RP for the Syar Lincoln Facility as necessary to ensure compliance with the Storm Water Permit.

168.    CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to conduct the storm water discharge visual observations required by Section B(4) of the Storm Water Permit during storm events.

169.    CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to conduct the storm water discharge visual observations required by Section B(4) of the Storm Water Permit during the first hour of discharge.

170.    CPSA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to conduct visual observations of storm water discharges during every month of every Wet Season, as required by Section B(4) of the Storm Water Permit.

171.    CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and/or source of any

pollutants observed in the Facility's storm water discharges, as required by Section B(4) of the Storm Water Permit.

172.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to document any responses to pollutants observed in the Facility's storm water discharges that will reduce or prevent these pollutants, as required by Section B(4) of the Storm Water Permit.

173.   CPSA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to collect storm water samples during the first hour of discharge, as required by Section B(5) of the Storm Water Permit.

174.   CPSA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to collect storm water samples during the first storm event of the Wet Season, as required by Section B(5) of the Storm Water Permit.

175.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators failed to collect storm water samples from all discharge locations at the Syar Lincoln Facility during every Wet Season, as required by Section B(5) of the Storm Water Permit.

176.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators fail to analyze storm water samples for all pollutants likely to be present in the Facility's discharges in significant quantities, as required by Section B(5) of the Storm Water Permit.

**H.    Defendants' Failure to Comply with the Storm Water Permit's Reporting Requirements.**

177.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators fail to submit complete and adequate Annual Reports that comply with Section B(14) of the Storm Water Permit.

178.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators fail to include a summary of their visual observations and sampling results in Annual Reports, as required by the Storm Water Permit.

179.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators fail to include an evaluation of their visual observations and sampling and analysis results in Annual Reports, as required by the Storm Water Permit.

180.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators fail to include the laboratory reports for the Facility's sample analysis in Annual Reports, as required by the Storm Water Permit.

181.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators fail to acknowledge or explain their noncompliance with the Storm Water Permit in every Annual Report submitted for the Facility in at least the last five (5) years.

182.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators fail to include an evaluation report that explains necessary SWPPP revisions and a schedule for implementing the SWPPP revisions in every Annual Report submitted for the Facility in at least the last five (5) years.

183.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners' and/or Operators' certifications of the Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report") in the Facility's Annual Reports are erroneous because the Syar Lincoln Facility Owners and/or Operators have not developed and/or implemented the BMPs required by the Storm Water Permit.

184.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners' and/or Operators' Annual Reports inaccurately state that the BMPs set out in the Facility's SWPPP's address existing potential pollutant sources when they do not.

185.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners' and/or Operators' Annual Reports falsely stated that the Facility's SWPPP is up to date when it is not.

186.   CSPA is informed and believes, and thereon alleges, that the Syar Lincoln

Complaint                              27

Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in Annual Reports are erroneous because the Syar Lincoln Facility Owners and/or Operators have not revised the Facility's SWPPP to address all Storm Water Permit violations.

187. CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in Annual Reports are erroneous because the Syar Lincoln Facility Owners and/or Operators have not revised the Facility's M&RP to address all Storm Water Permit violations.

**I.   Defendants' Failure to Comply with the Regional Board's Water Code Section 13267 Order for Technical Report.**

188. On April 13, 2012 the Regional Board issued a Water Code Section 13267 Order for Technical Report for the Syar Lincoln Facility (hereinafter "13267 Order").

189. The 13267 Order informed the Syar Lincoln Facility Owners and/or Operators of their continued discharges of pollutants, failure to develop adequate BMPs, and failure to properly revise the Facility's SWPPP and M&RP.

190. The 13267 Order required the Syar Lincoln Facility Owners and/or Operators to review past sampling data, annual reporting, and current BMPs, and modify existing BMPs and/or implement new BMPs to reduce or eliminate the discharge of pollutants as necessary to comply with the Storm Water Permit. The 13267 Order required the Syar Lincoln Facility Owners and/or Operators to submit a written response by May 14, 2012, along with a revised SWPPP and M&RP for the Facility that addressed the exceedances and Storm Water Permit violations.

191. On May 18, 2012, the Syar Lincoln Facility Owners and/or Operators replied to the Regional Board but did not include the required review and information required by the 13267 Order or a revised SWPPP or M&RP.

192. CSPA is informed and believes, and thereon alleges, that the Syar Lincoln Facility Owners and/or Operators have never submitted the Technical Report that

1    complies with the Regional Board's 13267 Order.

2    **VI.    CLAIMS FOR RELIEF**

3                            **FIRST CAUSE OF ACTION**

4    **Defendants' Discharges of Contaminated Storm Water in Violation of the Storm
     Water Permit's Effluent Limitation B(3) and the Clean Water Act.**

5

6                    **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

7           193.    CSPA incorporates the allegations contained in the above paragraphs as

8    though fully set forth herein.

9           194.    CSPA is informed and believes, and thereon alleges, that Defendants failed

10   and continue to fail to reduce or prevent levels of pollutants in the Facility's storm water

11   discharges through development and implementation of BAT/BCT.

12          195.    CSPA is informed and believes, and thereon alleges, that Defendants violate

13   Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act each time

14   storm water is discharged from the Facility.

15          196.    CSPA is informed and believes, and thereon alleges, that Defendants'

16   violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water

17   Act are ongoing and continuous.

18          197.    Defendants will continue to be in violation of the Storm Water Permit and

19   the Clean Water Act each and every time storm water discharges from the Syar Lincoln

20   Facility in violation of Effluent Limitation B(3) of the Storm Water Permit.

21          198.    Each and every time Defendants discharge contaminated storm water from

22   the Syar Lincoln Facility in violation of Effluent Limitation B(3) of the Storm Water

23   Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33

24   U.S.C. § 1311(a).

25          199.    Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§

26   1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged

27   above, Defendants are subject to an assessment of civil penalties for each and every

28   violation of the Clean Water Act since October 29, 2009.

200.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(1) and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

201.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

202.   CSPA is informed and believes, and thereon alleges, that Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that adversely impact human health and/or the environment.

203.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Syar Lincoln Facility occur each time storm water discharges from the Syar Lincoln Facility.

204.   CSPA is informed and believes, and thereon alleges, that Defendants violate Receiving Water Limitation C(1) of the Storm Water Permit each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment discharges from the Syar Lincoln Facility.

205.   CSPA is informed and believes, and thereon alleges, that Defendants' violations of Receiving Water Limitation C(1) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

206.   Defendants will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every time contaminated storm water discharges from the

Complaint                                          30

Syar Lincoln Facility in violation of Receiving Water Limitation C(1) of the Storm Water Permit.

207.   Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

208.   Pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since October 29, 2009.

209.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(2) and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

210.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

211.   CSPA is informed and believes, and thereon alleges, that Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of water quality standards.

212.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards occur each time storm water discharges from the Syar Lincoln Facility.

213.   Defendants violate Receiving Water Limitation C(2) of the Storm Water

Permit each and every time storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards discharges from the Syar Lincoln Facility.

214.   CSPA is informed and believes, and thereon alleges, that Defendants' violations of Receiving Water Limitation C(2) of the Storm Water Permit and Clean Water Act are ongoing and continuous.

215.   Each and every violation of Receiving Water Limitation C(2) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

216.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since October 29, 2009.

217.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

218.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

219.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately develop a SWPPP for the Syar Lincoln Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

220.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately implement a SWPPP for the Syar Lincoln Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

221.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise a SWPPP for the Syar Lincoln Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

222.   Defendants have been in violation of Section A and Provision E(2) of the Storm Water Permit for failing to develop, implement, and/or revise an adequate SWPPP for the Syar Lincoln Facility every day since at least October 29, 2009.

223.   Defendants' violations of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

224.   Defendants will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act each and every day Defendants fail to adequately develop, implement, and/or revise the SWPPP for the Syar Lincoln Facility.

225.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Syar Lincoln Facility is a separate and distinct violation of the Clean Water Act.

226.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since October 29, 2009.

227.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

**FIFTH CAUSE OF ACTION**

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

228.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

229.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately develop an M&RP for the Syar Lincoln Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

230.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately implement an M&RP for the Syar Lincoln Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

231.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise an M&RP for the Syar Lincoln Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

232.   Defendants have been in violation of Section B and Provision E(3) of the Storm Water Permit for their failure to develop, implement, and/or revise an adequate M&RP for the Syar Lincoln Facility every day since at least October 29, 2009.

233.   Defendants' violations of Section B and Provision E(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

234.   Defendants will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the Clean Water Act each and every day Defendants fail to adequately develop, implement, and/or revise an M&RP for the Syar Lincoln Facility.

235.   Each and every violation of the Storm Water Permit's M&RP requirements at the Syar Lincoln Facility is a separate and distinct violation of the Clean Water Act.

236.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since October 29, 2009.

237. An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

### SIXTH CAUSE OF ACTION

**Defendants' Failure to Comply With Reporting Requirements in Violation of the Storm Water Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

238. CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

239. CSPA is informed and believes, and thereon alleges, that Defendants' Annual Reports have not met the reporting requirements of the Storm Water Permit, in violation of Section B(14) of the Storm Water Permit.

240. CSPA is informed and believes, and thereon alleges, that Defendants' Annual Reports are inaccurate, in violation of Sections A(9) and B(14) of the Storm Water Permit.

241. CSPA is informed and believes, and thereon alleges, that Defendants' Annual Reports are incomplete, in violation of Sections A(9) and B(14) of the Storm Water Permit.

242. Defendants have been in daily violation of the reporting requirements of the Storm Water Permit for failing to report as required by Sections A(9) and B(14) of the Storm Water Permit every day since at least October 29, 2009.

243. Defendants' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

244. Pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above,

Defendants are subject to an assessment of civil penalties for each and every violation of the CWA since October 29, 2009.

245.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## SEVENTH CAUSE OF ACTION
**Defendant's Failure to Comply with the Regional Board's 13267 Order in Violation of the Clean Water Act.**

### 33 U.S.C. §§ 1342, 1365(a) and 1365(f); Cal. Water Code §§ 13267

246.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

247.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to submit a Technical Report that complied with the Regional Board's April 13, 2012 13267 Order.

248.   Defendants have been in violation of the Clean Water Act for its failure to comply with an order issued by the State with respect to the Storm Water Permit every day since at least May 14, 2012.

249.   Defendants' violations of the Clean Water Act are ongoing and continuous.

250.   Defendants will continue to be in violation of the Clean Water Act each and every day Defendants fails to adequately submit a Technical Report to the Regional Board that complies with the 13267 Order.

251.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since May 14, 2012.

252.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## VII.   RELIEF REQUESTED

253.   CSPA respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendants to have violated and to be in violation of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for their violations of the substantive and procedural requirements of the Storm Water Permit;

b.   A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

c.   A Court order assessing civil monetary penalties for each violation of the Clean Water Act at $37,500 per day per violation for violations occurring since October 29, 2009, as permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

d.   A Court order awarding CSPA its reasonable costs of this suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

e.   Any other relief as this Court may deem appropriate.

Dated: May 21, 2014                           Respectfully submitted,

LAWYERS FOR CLEAN WATER, INC.

_____
Drevet Hunt
Layne Friedrich
Attorneys for Plaintiff
California Sportfishing Protection Alliance

Complaint                             37